**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO. 24-41** |
| **v.** | * | **SECTION: "D"** |
| **CURTIS SQUIRE** | * | |

* * *

**GOVERNMENT'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE INDICTMENT**

**NOW INTO COURT** comes the United States of America, appearing herein through the undersigned Assistant United States Attorney, and submits its opposition to defendant Curtis Squire's motions to dismiss the Indictment. Rec. Doc. 31.

In March 2024, a federal grand jury in this District charged Curtis Sqire with being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8). Rec. Doc. 18. The Indictment alleges that Squire has prior disqualifying felony convictions, namely a 2018 conviction for conspiracy to distribute heroin, distribution of heroin, conspiracy to possess a firearm with a controlled dangerous substance, possession of a firearm with a controlled dangerous substance, conspiracy to obstruct justice, obstruction of justice, and conspiracy to possess stolen things; and a 2018 conviction for simple burglary and unauthorized use of a motor vehicle. *Id*. Squire argues the Indictment should be dismissed.

Squire argues that this Court should dismiss the indictment because the Supreme Court's *Bruen* decision establishes that 18 U.S.C. § 922(g)(1) is facially unconstitutional under the Second Amendment or because it is unconstitutional as applied to Squire. Squire argues in the alternative that the statute is unconstitutional under the *Bruen* history and tradition analysis or because it is void for vagueness. Rec. Doc. 31. In support of the challenges to § 922(g)(1), Squire conducts an

analysis of 18 U.S.C. § 922(g)(1) in light of the *Bruen* decision.

**STATE OF THE LAW**

The Supreme Court recently revisited its Second Amendment jurisprudence in *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). In *Bruen,* the Supreme Court invalidated a New York state law prohibiting most people from ever having a gun in a public place unless that citizen could make a nebulous showing of "proper cause," and thus obtain a carry permit. *Bruen*, 597 U.S. at 11–13. In reaching this holding, the Supreme Court disavowed "means-end scrutiny" as a component of Second Amendment claims. *See id*. at 19. Instead, the Supreme Court adopted a two-part analysis that focuses entirely on the Second Amendment's text, as informed by "historical tradition," with a special emphasis on how gun ownership rights were viewed at the time of the founding. First, a defendant must show that the conduct being regulated falls under the Second Amendment. Only once a defendant shows his conduct implicates the Second Amendment's plain text must the government "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *See id*. at 24.

The Supreme Court has not yet considered *Bruen*'s effect on § 922(g)(1). The Supreme Court has, however, strongly hinted that the law remains constitutional. *See id.* at 81 (Kavanaugh, J., concurring) (reiterating *Heller'*s assurances that felons can be prohibited from possessing guns); *id*. at 129–30 (Breyer, J., dissenting) ("I understand the Court's opinion today to cast no doubt on" *Heller*'s statement that felon-in-possession laws are presumptively lawful); *see also United States v. Rahimi*, 144 S. Ct. 1889 (2024) (reaffirming *Heller*'s ruling that prohibitions on firearm possession by felons are "presumptively lawful." *Rahimi*, 144 S. Ct. at 1902 (quoting *Heller*, 554 U.S. at 626, 627 n.26). Moreover, in its recent *Rahimi* decision, the Supreme Court left open the

possibility that the government may prohibit gun possession "by categories of persons thought by a legislature to present a special danger of misuse [of a firearm]." *Id.* at 1901.

The motion to dismiss cites to the Fifth Circuit decision in *United States v. Connelly*, which ruled 18 U.S.C. § 922(g)(3) as unconstitutional. *Connelly* can be distinguished as a challenge to a distinct part of the statute that does not concern felons. Further, there has been a change to the state of the law since the filing of the motion to dismiss the Indictment. The Fifth Circuit recently adjudicated its first preserved facial and "as-applied" *Bruen* challenges to § 922(g)(1)'s felon prohibition. *See United States v. Diaz*, ---F.4th---, 2024 WL 4223684 (5th Cir. Sept. 18, 2024). While Squire referenced the oral arguments in *Diaz* in the motion to dismiss, we now have the benefit of the Fifth Circuit ruling and analysis in the matter. In *Diaz*, the Fifth Circuit held that *Bruen* abrogated existing Fifth Circuit precedent, with the Court rejecting the government's argument that, because this Court's Second Amendment precedent has always involved historical analysis, *Bruen* did not clearly undermine existing Fifth Circuit caselaw. *See id.* at *4. *Diaz* similarly found that the Supreme Court's numerous post-*Bruen* statements that § 922(g)(1) remained "presumptively lawful" did not prevent lower courts from revisiting § 922(g)(1)'s constitutionality, since the Supreme Court's comments, even if indicative of its ultimate view on the issue, were "mere dicta," which did not "supplant the most recent analysis by the Supreme Court in *Rahimi*." *See id.*[1]

---

[1] In contrast, in *United States v. Medina-Cantu*, 113 F.4th 537, 541 (5th Cir. 2024), issued three weeks before *Diaz*, the Fifth Circuit held that the Supreme Court's *Bruen* and *Rahimi* decisions were not clear enough regarding their effect on § 922(g)(5)'s illegal-alien prohibition to abrogate existing Fifth Circuit precedent regarding that statue, in part because those new Supreme Court decisions did little to clarify the scope of "the people" afforded Second Amendment protection. *See Medina-Cantu*, 113 F.4th at 541 ("*Rahimi*, like *Bruen,* did not unequivocally abrogate our precedent that the plain text of the Second Amendment does not encompass illegal aliens. *Rahimi*, like *Bruen*, provides little clarification as to *who* is protected by the Second Amendment.").

*Diaz* thus applied *Bruen*'s two-part test to § 922(g)(1). Regarding the first step, the Court held that, despite Diaz's felon status, he was a member of "the people" as the term is used in the Second Amendment. *See id*. at *5. In reaching this conclusion, the Court stated that felony status had no bearing on first-step analysis, and instead "becomes [relevant] in *Bruen*'s second step of whether regulating firearm use in this way is 'consistent with the Nation's historical tradition.'" *See id.* The Court acknowledged that, as a result of this view, *Bruen*'s two-step test was "effectively collapsed into one question: whether the law is consistent with our Nation's history of firearm regulation." *See id*. (citing *Rahimi*, 144 S. Ct., at 1898).

Despite clearing these post-*Bruen* hurdles, Diaz's Second Amendment claim failed at the final step of *Bruen* analysis, as the Fifth Circuit found that the § 922(g)(1) squared with the country's "history and tradition" under the facts of Diaz's case. The Fifth Circuit began by noting that Diaz had a previous felony theft conviction, and that numerous colonial-era laws "severely punish[ed] people like Diaz who had been convicted of theft," often by way of the death penalty. *See id*. at *6. The Fifth Circuit stressed that these capital punishment laws carried a similar "why" (*i.e.*, purpose) as § 922(g)(1)'s gun restriction: both laws sought to "deter violence and lawlessness," even if founding-era capital punishment laws took a more absolute approach to that goal than § 922(g)(1)'s relatively modest gun prohibition. *See id*. at *7.

The Fifth Circuit also noted that founding-era capital punishment laws (including for theft) and § 922(g)(1) carried a similar "how" (*i.e.*, approach) to enacting their shared goal of deterring violence and lawlessness: both laws permanently punished offenders as a result of their serious crime. *See id.* ("As to the "how," these laws achieved their goals by permanently punishing offenders, as does § 922(g)(1). Capital punishment is obviously permanent, and the majority of the estate forfeiture laws that the government cites did not provide an opportunity for offenders to

regain their possessions."). In making this comparison, the Fifth Circuit rejected Diaz's claim that capital punishment laws were too dissimilar to modern gun restrictions to be used as a historical analogy, noting that the death penalty encompasses the lesser punishment of permanent firearm disarmament. *See id.* ("Here, if capital punishment was permissible to respond to theft, then the lesser restriction of permanent disarmament that § 922(g)(1) imposes is also permissible.").

The Fifth Circuit further noted that, apart from the capital punishment analogy, many founding-era laws dealt expressly with firearm dispossession where the underlying crimes posed a real threat of violence or public disorder. The Fifth Circuit cited the so-called "going armed" laws common to the founding era, which authorized permanent dispossession of firearms for people that carried them publicly in a threatening or offensive manner. *See id.* at *8. Again, the Fifth Circuit stressed that broad analogical reasoning could be used when comparing these "going armed" laws to § 922(g)(1); what mattered was the broad principle behind the two laws, not their exact contours or enforcement mechanisms. *See id.* at *8 (noting that "going armed" laws sought to punish those whose conduct "disrupted the public order," and "led almost necessarily to violence."); see *id.* ("Going armed laws are relevant historical analogues to § 922(g)(1), just as *Rahimi* found them to be with respect to § 922(g)(8).").

After this extensive analysis, the Fifth Circuit rejected Diaz's "as-applied" challenge. *See id.* at *9 ("Taken together, laws authorizing severe punishments for thievery and permanent disarmament in other cases establish that our tradition of firearm regulation supports the application of § 922(g)(1). Diaz's Second Amendment claim fails." (internal citation and quotation marks omitted)). Failure of Diaz's "as-applied" claim also doomed his facial arguments, since the Fifth Circuit had already determined § 922(g)(1) remained constitutional in at least some circumstances. *See id.* ("To sustain a facial challenge, 'the challenger must establish that no set of

circumstances exists under which the statute would be valid.' This Diaz cannot do, because the statute is constitutional as applied to the facts of his own case." (quoting *United States v. Salerno*, 481 U.S. 739, 745, (1987))).

**THE IMPACT OF *DIAZ* ON SQUIRE'S MOTION TO DISMISS**

The Fifth Circuit's *Diaz* decision foreclosed Squire's facial challenge to the constitutionality of § 922(g)(1) by establishing a broad class of felony predicates (*i.e.*, those mirroring founding-era theft offenses) for which § 922(g)(1) permits firearm dispossession. *See Diaz*, 2024 WL 4223684, at *7 ("[A]t least one of the predicate crimes that Diaz's § 922(g)(1) conviction relies on—theft—was a felony and thus would have led to capital punishment or estate forfeiture. Disarming Diaz fits within this tradition of serious and permanent punishment.").

Through its discussion of "going armed" laws, *Diaz* implies that any felony predicate with a common-sense nexus to violence and/or public safety concerns will permit dispossession under § 922(g)(1). *See id.* at *8 (noting that "going armed" laws aimed to stem the threat posed by criminals that "disrupted the public order" through conduct likely to lead to "actual violence"); *see also Rahimi*, 144 S. Ct. at 1901 ("Taken together, the surety and going armed laws confirm what common sense suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed."). Because *Diaz* held there are least some circumstances where § 922(g)(1) is constitutional, Squire's facial Second Amendment claim—like Diaz's—fails without additional analysis. *See id.* at *9 ("To sustain a facial challenge, 'the challenger must establish that no set of circumstances exists under which the statute would be valid.'" (quoting *Salerno*, 481 U.S. at 745).

Like Diaz, Squire has multiple predicate felony convictions, importantly conspiracy to possess stolen things, simple burglary, and unauthorized use of a motor vehicle. Because these

convictions are of a kind with the theft conviction that the *Diaz* decision analyzed – and deemed a sufficient predicate to disarm felons – this also forecloses Squire's as applied challenge. While holding that Diaz's theft conviction was sufficient to disarm him, the Fifth Circuit explicitly left open the question of whether disarming for other felony convictions fits within the historical tradition. *See Diaz*, 2024 WL 4223684, at *16 n.4 ("Our opinion today does not foreclose future as-applied challenges by defendants with different predicate convictions."). Thus, if the Court does not find that Squire's convictions for conspiracy to possess stolen things, simple burglary, and unauthorized use of a motor vehicle comport with the Fifth Circuit's *Diaz* analysis of theft predicates, the question remains open whether disarming Squire based on his convictions for conspiracy to distribute heroin, distribution of heroin, conspiracy to possess a firearm with a controlled dangerous substance, possession of a firearm with a controlled dangerous substance, conspiracy to obstruct justice, obstruction of justice is consistent with the historical tradition of firearms regulation in the United States.

Courts applying *Bruen* have recognized that even the most "robust view of the Second Amendment still provides 'that legislatures have the power to prohibit dangerous people from possessing guns.'" *Leonard v. United States*, No. 18-CR-20743-RAR-2, 2023 WL 2456042, at *10 n.7 (S.D. Fla. Mar. 10, 2023) (quoting *Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting)). Both *Rahimi* and *Diaz* recognize as much in their holdings.

Federal courts have also long recognized the common-sense assessment that violence often follows drugs and drug-traffickers, especially when the latter have access to guns. *See United States v. Garcia*, 797 F.3d 320, 321 (5th Cir. 2015) (noting this correlation in the context of a guidelines enhancement); *see also Smith v. United States*, 508 U.S. 223, 240 (1993) (endorsing Congress's common-sense assessment that "drugs and guns are a dangerous combination," and

thus worthy of legislation). The Second Amendment has never required individualized "dangerousness" assessments; it is enough that Squire belongs to a class of people (drug dealing felons who have previously illegally possessed guns) credibly perceived as "dangerous" by the political body, as represented by Congress and the various state legislatures. *See United States v. Rene E.*, 583 F.3d 8, 15–16 (1st Cir. 2009) ("Perhaps the most accurate way to describe the dominant understanding of the right to bear arms in the Founding era is as . . . limited to those members of the polity who were deemed capable of exercising it in a virtuous manner."). Indeed, there is little historical evidence that the groups most commonly denied Second Amendment rights in colonial America—including Indians, black freedmen, and religious/political dissidents—ever had their gun restrictions turn on an individualized assessment of a member's dangerousness or risk of violence; instead, the political body's perception of risk, as expressed through colonial and founding-era legislatures, was enough to disarm people in these groups. *See, e.g.*, *United States v. Nutter*, 624 F. Supp. 3d 636, 645 (S.D. W. Va. 2022) ("Common sense tells us that the public understanding of the Second Amendment at the time of its enactment, which allowed for disarmament of Blacks and Native Americans based on their perceived threat, would have accepted disarmament of people convicted of misdemeanor crimes of domestic violence . . . .").

There were of course no founding-era laws prohibiting drug trafficking specifically because most illegal drugs sold and used today, like the heroin forming the basis of Squire's predicate felony, did not even exist at the time of the founding. But the lack of any dead-on founding-era law prohibiting drug distribution does not help Squire. Founding-era lawmakers could not have anticipated the staggering sophistication, collateral violence, and social corrosion inherent to the modern-day transnational drug trade. The Supreme Court has warned against being too formalistic in "historical analogue" comparisons under these circumstances. *Bruen*, 597 U.S.

at 27 (stating that cases implicating "unprecedented societal concerns or dramatic technological changes may require a more nuanced approach" to the "historical analogy" step of *Bruen* analysis).

Accordingly, the relevant question is not whether founding-era legislatures actually passed laws addressing a drug-trafficking problem that, at the time, did not even exist; instead, what matters is whether founding-era legislatures would have understood their powers to include the ability to pass laws to combat a similar problem, including laws imposing severe criminal punishments and/or estate forfeiture. *See Rahimi* 144 S. Ct. at 1897–98 (clarifying that the Second Amendment does not demand "a law trapped in amber"; instead, it "permits more than just those regulations identical to ones that could be found in 1791"); *see also id.* at 1898 (stating that the "historical analogy" test turns on "whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition" by ascertaining "whether the new law is 'relevantly similar' to laws that our tradition is understood to permit," not whether an exact copy of the law at issue existed at the time). In her concurrence, Justice Barrett even cautioned lower courts not to presume that founding-era legislatures always used their law-making authority to "maximal[]" extent possible, warning that this "overly specific" line of reasoning leads to "serious problems" in *Bruen* analysis. *See id. at* 1925 (Barrett, J., concurring).

Relying on these principles, it is difficult to imagine how this country's history and tradition could be offended by disarming drug dealers. Indeed, modern drug-trafficking offenses have a more obvious tie-in to violence and social disorder than many of the founding-era capital crimes worthy of the death penalty, including the simple theft laws at issue in *Diaz*. Similarly, like the "going armed" laws discussed in *Rahimi* and *Diaz*, felony drug-trafficking statutes seek to diffuse the risk of violence that so often accompanies another crime. *See, e.g., United States v. Bannister*, 786 F. Supp. 2d 617, 669 (E.D.N.Y. 2011) ("In moral terms, those working in the drug

trade are primarily responsible not for drug abuse but for the trade itself and the violence and extortion attendant to it.”). Finally, that founding-era legislatures commonly punished the trafficking of contraband generally (from stolen horses to purloined mail to counterfeit money and securities) shows that, from the founding period onward, legislatures aimed to curb marketplaces that trafficked in illicit goods. *See, e.g.*, 6 William Waller Hening, *The Statutes at Large; Being a Collection of All the Laws of Virginia from the First Session of the Legislature, in the Year 1619*, page 130 (1819) (1748 law) (making the trading of stolen horses a capital crime); *An Act to Establish the Post-Office and Post Roads within the United States*, § 17 1 Stat. 232, 237 (1792) (punishing mail theft with the death penalty); *An Act for the Punishment of Certain Crimes Against the United States*, §§ 115, 1 Stat. 112, 115 (1790) (punishing with death the making or trading of counterfeit or forged securities).

The robust post-founding era tradition of laws dispossessing felons—including, perhaps most frequently, drug felons—also cuts against Squire’s argument. Squire cannot dispute that laws prohibiting convicted drug dealers from possessing guns are ubiquitous, longstanding, and near-universally supported in this country. As multiple Justices pointed out in *Rahimi*, post-ratification (*i.e.*, post-founding period) history can help in *Bruen*’s “history and tradition” analysis, especially when the problem at issue was not contemplated by the founders themselves. *See Rahimi*, 144 S. Ct. at 1917 (Kavanaugh, J., concurring)) (“[T]he Framers themselves intended that post-ratification history would shed light on the meaning of vague constitutional text.”); *see also id.* at 1924 (Barrett, J., concurring) (noting that post-ratification history can be “an important tool”).

This principle—that an uncontroversial and long-held consensus that a law is constitutional can, in itself, be evidence that the law does not offend the nation’s “history and tradition”—is not

sourced from any newer, non-originalist interpretive cannon. Instead, it is an interpretive tool as old as the Supreme Court itself. *See id.* at 1917 (Kavanaugh, J., concurring) ("Writing for the Court [in *McCulloch v. Maryland*], Chief Justice Marshall invoked post-ratification history to conclude that Congress's authority to establish a national bank could 'scarcely be considered as an open question'" given the bank's endorsement by "many successive legislatures"); *see also id.* ("[James] Madison articulated the Framers' expectation and intent that post-ratification history would be a proper and important tool to help constitutional interpreters determine the meaning of vague constitutional text. . . . In relying on post-ratification history as a proper tool to discern constitutional meaning, Madison and Marshall make for a formidable duo.").

Addressing Squire's argument that the statute is unconstitutional to him because he possessed his firearm within his home, we can look to *D.C. v. Heller* alongside the prior history and tradition analysis. The Supreme Court recognized in its decision in *D.C. v. Heller* that while the regulation at issue in the case – a ban on firearm possession inside the home – was unconstitutional, some persons could be validly disqualified from the exercised of Second Amendment rights. (*See D.C. v. Heller*, 554 U.S. 570, 635, 128 S. Ct. 2783, 2822, 171 L. Ed. 2d 637 (2008) ("Assuming that Heller is not disqualified from the exercise of Second Amendment rights, the District must permit him to register his handgun and must issue him a license to carry it in the home."). The suggestion that the government must present an analogous regulation regarding felons possessing firearms in the home, finds no support in *Heller*, *Bruen*, or *Rahimi*. *See Rahimi* 144 S. Ct. at 1925 (Barrett, J., concurring) ("[I]mposing a test that demands overly specific analogues has serious problems," including "assum[ing] that founding era legislatures maximally exercised their power to regulate"). The constitutionality of the statute as applied to

Squire is satisfied by the analysis of the history and tradition of disarming felons with similar convictions. Under the prior analysis of Squire's felony history, he is one such person.

In sum: Squire's as-applied challenge falls to *Diaz*'s analysis of the history and tradition of punishing theft. In the alternative, it overlooks the common-sense link between violence (and thus "dangerousness," per the political body's consensus) and drug-trafficking activity. For these reasons, Squire cannot dispute that he is the type of "dangerous" person the Second Amendment allows to be dispossessed of guns, even if another, "non-violent" felon might be able to mount a successful "as-applied" challenge to § 922(g)(1) under *Diaz*.

**VAGUENESS CHALLENGE**

Squire's next challenge to § 922(g)(1) is that it is void for vagueness. Rec. Doc. 31. "A criminal statute survives…vagueness review if it defines the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *United States v. Edwards*, 182 F.3d 333, 335 (5th Cir. 1999) (internal quotations and punctuation omitted). "[W]hen a vagueness challenge does not involve First Amendment freedoms, we examine the statute only in light of the facts of the case at hand." *Id*. at 335. 18 U.S.C. § 922(g)(1) provides that "it shall be unlawful for any person who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year to possess in or affecting any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922 (cleaned up). The prohibited conduct is clearly defined with sufficient definiteness.

**COMMERCE CLAUSE CHALLENGE**

Finally, Squire challenges 18 U.S.C. § 922(g)(1) on Commerce Clause grounds. The motion to dismiss concedes that this argument is foreclosed by *United States v. Seekins.* No. 21-

10556, 2022 WL 3644185. The statute in its text includes an element of interstate travel. "There is no additional requirement that, to apply the law constitutionally, the Government must prove some economic activity beyond the interstate movement of the weapon." *United States v. Seekins*, No. 21-10556, 2022 WL 3644185, at *2 (5th Cir. Aug. 24, 2022), cert. denied, 143 S. Ct. 2668 (2023).

**CONCLUSION**

For the foregoing reasons, the United States of America respectfully requests that this Honorable Court deny defendant Curtis Squire's Motion to Dismiss the Indictment.

Respectfully submitted,

DUANE A. EVANS
UNITED STATES ATTORNEY

*/s/ Sarah Dawkins*
SARAH DAWKINS
Assistant United States Attorney
650 Poydras Street, Suite 1600
New Orleans, Louisiana 70130
Telephone: (504) 680-3055

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on October 8, 2024, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to defense counsel of record.

*/s/ Sarah Dawkins*
SARAH DAWKINS
Assistant United States Attorney