UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL DOCKET |
| VERSUS | * | NUMBER: 24-041 |
| CURTIS SQUIRE | * | SECTION: "D" |

## REPLY BRIEF IN FURTHER SUPPORT OF MOTION TO DISMISS THE INDICTMENT

Curtis Squire, through undersigned counsel, respectfully submits this reply in support of his motion to dismiss the indictment. As explained below, the government fails to meet its burden of providing sufficient historical evidence in support of the constitutionality of section 922(g)(1) as applied to him. His motion should be granted and his indictment should be dismissed.

I. **The Fifth Circuit's recent *Diaz* decision supports Mr. Squire's argument.**

The Court should find that the government has not met its burden of providing historical evidence of a longstanding tradition with respect to Mr. Squire's prior convictions. Importantly, the Fifth Circuit's recent decision in *United States v. Diaz*, 116 F.4th 458 (5th Cir. 2024) affirmed many of Mr. Squire's arguments, while also clarifying the government's burden to defend the indictment—a burden that, as explained herein, the government has failed to meet.

In *Diaz*, the Fifth Circuit confirmed that the Supreme Court's *Bruen* decision rendered prior precedent upholding the constitutionality of 18 U.S.C. § 922(g)(1) "obsolete." *Diaz*, 116 F.4th at 465 (recognizing abrogation of *United States v. Emerson*,

270 F.3d 203 (5th Cir. 2001); [1] *United States v. Darrington*, 351 F.3d 632 (5th Cir. 2003); and their progeny). Further, the Fifth Circuit held that "[t]he mentions of felons in [*Heller* and *Rahimi*] are mere dicta" that does not render the statute constitutional and "cannot supplant" the "historical inquiry" mandated by *Bruen*. *Id.* at 465-66. Thus, the government's subjective opinion that two justices on the Supreme Court have "strongly hinted that [§ 922(g)(1)] remains constitutional" is wholly irrelevant to resolving this motion and does not lessen the government's burden. *See* Gov't Opp. at 2.

Second, *Diaz* confirmed—consistent with Mr. Squire's argument—that persons convicted of felonies are among "the people" protected by the Second Amendment, flatly rejecting the government's argument in that case. *Diaz*, 116 F.4th at 466-67.

Third, *Diaz* explained that "[t]o survive [a defendant's] as-applied challenge [to § 922(g)(1)], the government must demonstrate that the Nation has a longstanding tradition of disarming someone with a criminal history analogous to [his]." *Id.* at 467. That means the government must establish "a historical tradition of permanently punishing certain offenders *who the evidence shows would have been considered felons and exposed to these types of penalties at the time of the Founding*." *Id.* at 469 (emphasis added). In other words, the Court emphasized that "[s]imply classifying a crime as a felony does not meet the level of historical rigor required by *Bruen* and its progeny" because "not all felons today would have been considered felons at the Founding." *Id.*

---

[1] Mr. Squire respectfully disagrees with the historical analogues and reasoning that the Fifth Circuit relied on in denying the constitutional challenges in *Diaz*. Recognizing that this Court is bound by *Diaz*, he notes this disagreement to preserve his claims for further review and proceeds to explain why even under *Diaz*, his motion should prevail.

2

In *Diaz*, the government was able to carry this burden, but the Court made clear that the government did not simply rely on evidence that Diaz was a felon and instead brought forth "evidence . . . more specifically targeted to Diaz's circumstances" to show that he had been convicted of a felony—vehicle theft—that was analogous to a felony at the time of the Founding punishable by death or permanent estate forfeiture. *Id.* at 468; *see also id.* ("The fact that Diaz is a felon today, then, does not necessarily mean that he would have been one in the 18th century. However, the government's evidence is more specifically targeted to Diaz's circumstances. It cites laws targeting the crime of theft, which was considered a felony at the time of the Founding and was punished accordingly."). Because the defendant had a conviction for vehicle theft, which the Court determined was analogous to the Founding-era capital felony of horse theft, § 922(g)(1) was constitutional as applied to him. *Id.* at 468-70.

Finally, *Diaz* expressly held that it "does not foreclose future as-applied challenges by defendants with different predicate convictions." 116 F.4th at 470 n.4. Here, Mr. Squire has "different predicate convictions" than the defendant in *Diaz*. Thus, *Diaz's* conclusion that § 922(g)(1) was constitutional as applied to *that* defendant has no application here. Instead, the government must carry its burden to show that disarming Mr. Squire fits within the Nation's historical tradition. It has failed to do so.

II. **The government has put forth *zero* historical evidence to show that any of Mr. Squire's prior convictions are analogous to Founding-era capital felonies, and its reliance on *Diaz* is misplaced.**

The government first tries to defend its indictment solely by comparing Mr. Squire to the defendant in *Diaz*, asserting that Mr. Squire's as-applied challenge is "foreclosed"

because he has convictions that—in the government's view—"are of a kind with the theft conviction that the *Diaz* decision analyzed." Gov't Opp. at 6-7. Indeed, the government finishes its argument with: "In sum: Squire's as-applied challenge falls to *Diaz's* analysis of the history and tradition *of punishing theft*." *Id.* at 12 (emphasis added). But Mr. Squire does not have a prior conviction for theft, and the government's vague assertion of similarity is plainly insufficient to carry its heavy burden to put forth actual evidence of a historical tradition of disarming people with Mr. Squire's convictions. *Diaz* itself makes that clear, as the Court explicitly stated that "[o]ur opinion today does not foreclose future as-applied challenges by defendants *with different predicate convictions*." 116 F.4th at 470 n.4 (emphasis added). In other words, *Diaz* decided nothing beyond the appellant's theft conviction. *See also United States v. Collette,* 2024 WL 4457462, at *2 (5th Cir. Oct. 10, 2024) (holding that because "[the defendant] *also has a prior conviction for theft . . . Diaz* therefore controls") (emphasis added).

Fatally, the government has put forth no evidence at all that Mr. Squire's prior felony convictions are for crimes analogous to Founding-era capital felonies. "The fact that [Mr. Squire] is a felon today . . . does not necessarily mean that he would have been one in the 18th century," and, unlike in *Diaz*, the government has introduced no evidence "more specifically targeted to [Mr. Squire's] circumstances." 116 F.4th at 468. Therefore, it cannot rely on the mere existence of these convictions to establish that Mr. Squire would have been exposed to capital punishment and estate forfeiture at the Founding. *See id.* at 469.

### III. The government's contraband-and-drugs analogy both lacks historical evidence and fails the "relevantly similar" analogical reasoning test.

The government next claims that Mr. Squire's prior drug-related convictions are sufficient to carry its burden because "founding-era legislatures commonly punished the trafficking of contraband generally (from stolen horses to purloined mail to counterfeit money and securities)," which, in the government's opinion, "shows that, from the founding period onward, legislatures aimed to curb marketplaces that trafficked in illicit goods." Gov't Opp. at 10. But the government's analogy fails for at least three reasons: (1) two of its three proffered historical analogues do not, in fact, punish contraband trafficking at all, but instead punish distinctly different ills; (2) none of its three analogues are relevantly similar to modern laws prohibiting the distribution of controlled substances; and (3) the Supreme Court has expressed doubt that three laws alone show a historical tradition. Indeed, the government's reasoning is wholly inconsistent with *Bruen* and *Connelly*, and its argument about drug laws is contrary to the historical record.

First, on their face, two of the three historical laws simply do not stand for the proposition cited. The government cites a 1790 federal law punishing the forgery of public securities of the United States and the knowing use of forged securities with the intent to defraud, and it also cites a 1792 federal law prohibiting robbing a U.S. mail carrier or engaging in theft from the U.S. mail. But neither of these laws "punished the trafficking of contraband generally" or was "aimed to curb marketplaces that trafficked in illicit goods," as the government claims. Gov't Opp. at 10. Indeed, the first statute is quite explicitly aimed at counterfeiting and securities fraud, while the second is quite explicitly aimed at

5

protecting the U.S. mail from robbery and theft. Only the third law cited by the government, a 1748 colonial Virginia law prohibiting trading in stolen horses, has any connection whatsoever to "trafficking of contraband" or "illicit goods."

Second, none of the historical laws cited are relevantly similar to modern drug laws. As the Fifth Circuit explained post-*Rahimi*, "laws are 'relevantly similar' if they share a common 'why' and 'how': they must *both* (1) address a comparable problem (the 'why') *and* (2) place a comparable burden on the right holder (the 'how')." *United States v. Connelly*, 2024 WL 3963874, at *3 (5th Cir. Aug. 28, 2024) (emphasis added). Here, the government has cited three 18th century statutes that it claims (without much explanation) are analogous to modern drug laws, but none of the historical laws cited share a common "why" with modern laws targeting drug distribution. For example, the Virginia law punishing trading in stolen horses states that it was intended to deter horse thieves. By contrast, modern drug trafficking laws are intended to deter the sale and use of controlled substances. These are simply not comparable problems. And the problems of mail theft, counterfeiting, and securities fraud are even further afield from drug crimes.

Third, even if the government had been able to proffer three relevantly similar historical laws, the Supreme Court has expressed "doubt that *three* colonial regulations could suffice to show a tradition." *Bruen*, 597 U.S. at 46 (emphasis in original).

At root, the government's overly broad analogical reasoning contravenes Supreme Court precedent. As Justice Barrett cautioned in her *Rahimi* concurrence, while "[h]istorical regulations reveal a principle, not a mold . . . a court must be careful not to read a principle at such a high level of generality that it waters down the right." *United*

*States v. Rahimi*, 144 S. Ct. 1889, 1926 (2024) (Barrett, J., concurring). But that is exactly what the government is asking this Court to do—*i.e.*, to read a law punishing the trading of stolen horses, a law punishing mail theft, and a law punishing counterfeiting and securities fraud at such "a high level of generality" as establishing a "principle" that the legislature may pass a law disarming any person who violates any modern law that punishes trafficking in any type of "contraband" or "illicit goods." This is exactly the type of loose analogical reasoning that the *Bruen* majority warned against when the Court wrote: "To be clear, analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check," meaning that "courts should not 'uphold every modern law that remotely resembles a historical analogue,' because doing so 'risk[s] endorsing outliers that our ancestors would never have accepted.'" 597 U.S. at 30 (quoting *Drummond v. Robinson*, 9 F.4th 217, 226 (3d Cir. 2021).

While the government can certainly rely on "analogous historical regulation[s]" and need not identify a "historical twin," this Court must "hold the government to its heavy burden, as the Second Amendment 'is *not* a second-class right.'" *Connelly*, 2024 WL 3963874, at *3 (quoting *Bruen*, 597 U.S. at 70) (emphasis in original). Here, the government has simply not met its burden. It has failed to identify any analogous historical regulations and has instead resorted to the type of unmoored analogical reasoning that *Bruen* prohibits.

Additionally, a closer look at the historical record further shows that the government's loose analogical reasoning risks hollowing out *Bruen*'s test and rendering the Second Amendment a second-class right. For example, as the Fifth Circuit held in

7

*Connelly*, the next-closest historical analogue to drug laws are not horse-theft laws, but alcohol laws. *See id.* at *7 ("There was very little regulation of drugs (related to firearm possession or otherwise) until the late 19th century, so intoxication via alcohol is the next-closest 'historical analogue' that we can look to."). Yet, the government has not put forth any historical regulation that punished moonshining or illicit alcohol sales with capital punishment or estate forfeiture. Instead, the government ignores alcohol laws and claims—yet again, without historical evidence—that the lack of founding-era drug laws is irrelevant because "[t]here were of course no founding-era laws prohibiting drug trafficking specifically *because most illegal drugs sold and used today, like the heroin forming the basis of Squire's predicate felony, did not even exist at the time of the founding*." Gov't Opp. at 8 (emphasis added). But this assertion is simply wrong: The narcotic drug opium, from which heroin is derived,[2] *was* in existence at the founding—and it was completely unregulated until the 20th century.

"Opium's history in the United States is as old as the nation itself. During the American Revolution, the Continental and British armies used opium to treat sick and wounded soldiers," Erick Trickey, *Inside the Story of America's 19th-Century Opiate Addiction*, Smithsonian Magazine (January 4, 2018),[3] and "[d]uring the 19th century . . . the United States was the only major Western nation to allow unlimited distribution,

---

[2] According to the DEA, "[t]he opium poppy is the key source for many narcotics, including morphine, codeine, and heroin." Drug Enforcement Admin., *Drug Fact Sheet*: *Opium* (October 2022), https://www.dea.gov/sites/default/files/2023-04/Opium%202022%20Drug%20Fact%20Sheet.pdf

[3] Available at https://www.smithsonianmag.com/history/inside-story-americas-19th-century-opiate-addiction-180967673/#:~:text=Opium's%20history%20in%20the%20United,treat%20sick%20and%20wounded%20soldiers.

8

sale, and promotion of narcotics," David F. Musto, The American Experience with Stimulants and Opiates, 2 Persps. On Crime & Just. 51, 56 (1998); *id.* at 57 (explaining that there were "no laws against drug availability in the 19th century"). Whether or not it was wise public policy, the historical fact is that "[n]ineteenth-century America permitted an open market in narcotics," and "the use of opium and morphine and, later, cocaine and heroin was extensive." *Id.* at 56-57.

Given that alcohol and narcotics like opium are as old as the nation, it is certainly telling that the government has not introduced a single historical law punishing their illicit production or distribution—much less a law that imposed capital punishment or permanent estate forfeiture as a penalty. *Cf. Connelly*, 2024 WL 3963874, at *2 (explaining that "if laws at the Founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category") (quoting *Rahimi*, 144 S. Ct. at 1898). Instead, the government has essentially asked for a "regulatory blank check" to disarm anyone previously convicted of trafficking in so-called "contraband" or "illicit goods"—however those terms are defined by the modern legislature—by appealing to inapposite historical laws punishing trading in stolen horses, stealing U.S mail, and securities fraud. "Deciding whether a conceptual fit exists between the old law and the new requires the exercise of both analogical reasoning and sound judgment." *Id.* at *3 (citing *Rahimi*, 144 S. Ct. at 1897-98). Here, that "conceptual fit" is clearly lacking.

### IV. The government's "dangerousness" theory lacks historical support and is instead an appeal to the same means-end scrutiny that *Bruen* rejected.

The government next asserts that Mr. Squire can be permanently disarmed based on his prior drug-related convictions because there is a "common-sense link between violence (and thus 'dangerousness,' per the political body's consensus) and drug-trafficking activity." Gov't Opp. at 12. This theory too lacks any historical support and, troublingly, lacks any limiting principle. Indeed, the government is essentially claiming that Congress can disarm anyone that it decides to disarm. *See* Gov't Opp. at 8 (arguing that "[t]he Second Amendment has never required individualized 'dangerousness' assessments; *it is enough that Squire belongs to a class of people* (drug dealing felons who have previously illegally possessed guns) *credibly perceived as 'dangerous' by the political body, as represented by Congress and the various state legislatures*" for him to be disarmed (emphasis added)).

Of course, if the government were correct, then it wouldn't have been necessary for the Supreme Court in *Rahimi* or the Fifth Circuit in *Diaz* and *Connelly* to engage in any historical analysis at all. Those courts could have simply upheld the constitutionality of the statute as applied to those defendants because Congress perceived them as belonging to a class of dangerous people. But, of course, that isn't what those courts did, because that isn't the Second Amendment test demanded by *Bruen*. Instead, *Rahimi* and *Diaz* only affirmed those defendants' convictions after the government bore its heavy burden of proffering historical analogous—actual evidence, not mere argument—that established that disarming those defendants was "consistent with the principles that underpin our regulatory tradition." *Rahimi*, 144 S. Ct. at 1898; *see also Diaz*, 116 F.3d at 472. In contrast, the Fifth

Circuit held in *Connelly* that the defendant's charge was "inconsistent with our history and tradition of firearms regulations" because the government could not bear this burden. 2024 WL 3963874, at *10. Nor has it borne it here.

In support of its vague "dangerousness" argument, the government asserts that Mr. Squire can be disarmed because colonial-era legislatures disarmed Indians, black people, and religious and political dissidents. Gov't Opp. at 8. But the government has not shown that colonial-era laws disarming these minority groups—besides being unconstitutional on other grounds because they are based on blatant racism and religious discrimination—are "relevantly similar" to § 922(g)(1). And, indeed, they are not, because they do not share a common "why."[4] "[People like Mr. Squire] are not a class of political traitors, as British Loyalists were perceived to be. Nor are they like Catholics and other religious dissenters who were seen as potential insurrectionists. And even if we consider the racially discriminatory laws at the Founding, [Mr. Squire] is not like the minorities who the Founders thought threatened violent revolt." *See United States v. Daniels*, 77 F.4th 337, 354 (5th Cir. 2023), *cert. granted, judgment vacated on other grounds*, 144 S. Ct. 2707 (2024). Thus, "[a]pplying *Bruen's* framework to the proffered analogues, it follows that the government's theory of danger-based disarmament falls apart. The government identifies no class of persons at the Founding . . . who were 'dangerous' for reasons comparable to [people like Mr. Squire]." *Id.*; *see also* R. Doc. 31 at 8-10.

The government also asserts that "[t]hrough its discussion of 'going armed' laws,

---

[4] Furthermore, the Second Amendment is properly understood as a repudiation of such oppressive and discriminatory regulations, rather than an endorsement of them. *See Heller*, 554 U.S. at 592-95, 598.

11

*Diaz* implies that any felony predicate with a common-sense nexus to violence and/or public safety concerns will permit dispossession under § 922(g)(1)." Gov't Opp. at 6. But *Diaz* did no such thing. Rather, *Diaz* cited going armed laws only to address the "how" of disarmament, not the "why." *See* 116 F.4th at 470 ("We thus consider the government's proffered firearm-focused evidence," including going armed laws, "to further illuminate the 'how' of our country's tradition of punishment."); *id.* at 471 n.5 ("We focus on [going armed] laws to address the 'how' of colonial-era firearm regulation, rather than the 'why,' which is supported by other evidence."). To address the "why," *Diaz* relied solely on historical evidence of severely punishing certain felons at the Founding. *Id.* at 468-69. And, as explained in the prior sections, the government has failed to put forth evidence proving that disarming Mr. Squire fits within that tradition.

In its citation to *Diaz* and going armed laws, the government is again employing the type of shoot-from-the-hip reasoning that *Bruen* and its progeny condemn. In a footnote, *Diaz* even "acknowledge[d] that the justification behind going armed laws—to mitigate demonstrated threats of physical violence—does not necessarily support a tradition of disarming Diaz, whose underlying convictions do not inherently involve a threat of violence." *Id.* (citation and quotation omitted). It is far cry to take this footnote and suggest, as the government does, that *Diaz* supports the proposition that "any felony predicate with a common-sense nexus to violence and/or public safety concerns will permit dispossession under § 922(g)(1)." Gov't Opp. at 6.

The government has not demonstrated that any of Mr. Squire's prior convictions are for crimes that are sufficiently analogous to the founding-era offense of "going armed,"

which prohibited "riding or going armed, with dangerous or unusual weapons, to terrify the good people of the land." *Diaz*, 116 F.4th at 464 (quoting *Rahimi,* 144 S. Ct. at 1901); *see also Rahimi*, 144 S. Ct. at 1900 (explaining that "going armed" laws "punish[ed] those who had menaced others with firearms"). Further, as the Supreme Court explained in *Rahimi*, the "going armed laws . . . involved judicial determinations of whether a particular defendant likely would threaten or had threatened another with a weapon." 144 S. Ct. at 1902; *see also id.* at 1901 (explaining that "going armed laws, . . . applie[d] to individuals found to threaten the physical safety of another"). Yet, the government has not asserted that Mr. Squire has been the subject of any such judicial determination—to the contrary, it has argued that such individualized assessments are *not* required, and that Mr. Squire can be disarmed merely for belonging to a legislatively-determined "class." Gov't Opp. at 8.[5]

At base, the government's "dangerousness" argument boils down to the same means-end scrutiny that *Bruen* clearly rejected. *See* 597 U.S. at 17 ("To justify its regulation, the government may not simply posit that the regulation promotes an important interest."); *id.* at 19 ("*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context. Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."). Constitutional rights, including the Second Amendment

---

[5] Unlike Mr. Squire, the defendant in *Rahimi* was subject to a domestic violence restraining order issued by a state court based on "a finding that Rahimi represented 'a credible threat to the physical safety' of [his partner] or her family." 144 S. Ct. at 1895-96. "The order, entered with the consent of both parties, included a finding that Rahimi had committed 'family violence.' It also found that this violence was 'likely to occur again' and that Rahimi posed 'a credible threat' to the 'physical safety' of C. M. or A. R." *Id.* at 1895 (citations omitted).

13

right, are not subject to restriction based on "common sense" or "per the political body's consensus." Gov't Opp. at 12. Instead, the government must prove that the restriction is consistent with text, tradition, and history—and, here, it has not done so.

V. **The government's "post-founding era tradition" argument is both historically inaccurate and squarely foreclosed by precedent.**

The government's next argument is squarely foreclosed by binding precedent. The government argues (yet again, without any historical support) that there is a "robust post-founding era tradition of laws dispossessing felons—including, perhaps most frequently, drug felons." Gov't Opp. at 10. From there, it asserts a "principle" that "an uncontroversial and long-held consensus that a law is constitutional can, in itself, be evidence that the law does not offend the nation's 'history and tradition.'" *Id.* This argument is wrong both as a matter of historical fact and as a matter of Second Amendment precedent.[6]

As matter of fact, the historical scholarship shows that felon-dispossession laws did not emerge until the second or third decade of the 20th century—almost 150 years after the Founding. Further, such laws initially only applied to fugitives and persons convicted of crimes of violence (*i.e.*, not "drug felons," as the government speculates) and were not more broadly applied to all felons until later. For example, § 922(g)(1) was not made applicable to all felons until 1968—far too late to satisfy *Bruen*. And Mr. Squire cited that very scholarship in his initial motion to dismiss. *See* R. Doc. 31 at 9-10.

---

[6] The government also claims that "laws prohibiting convicted drug dealers from possessing guns are ubiquitous . . . and near-universally supported in this country." Gov't Opp. at 10. The government again cites nothing to support its claim—and, even if it did, this argument is obviously not relevant to the *Bruen/Diaz* analysis, which is concerned with historical tradition, not contemporary popularity.

14

Moreover, as a matter of precedent, *Bruen* made clear that "when it comes to interpreting the Constitution, not all history is created equal. 'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*.'" *Bruen*, 597 U.S. at 34 (quoting *Heller*, 554 U.S. at 634-35) (emphasis in original). "The Second Amendment was adopted in 1791," so, courts "must . . . guard against giving postenactment history more weight than it can rightly bear." *Id*. at 35. [T]o the extent later history contradicts what the text says, the text controls*,"* and "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id.* at 36 (cleaned up) (emphasis in original). In *Connelly*, the Fifth Circuit held that "[o]ffering three laws passed scores of years post-Ratification (and a fourth passed nearly half a century beyond that) misses the mark by a wide margin." 2024 WL 3963874, at *9 (citing *Bruen*, 597 U.S. at 35-36). Here, the government not only fails to cite any actual evidence, but the only evidence that it *could* cite "misses the mark by a[n] [even] wide[r] margin." *See id.* "That's a problem for the government." *Id.*

The government's argument flies in the face of *Diaz*, which held that a defendant's conviction for possessing a firearm as a felon could not satisfy *Bruen's* historical test—and therefore could not "justify[ ] the application of § 922(g)(1)"—because "possessing a firearm as a felon . . . was not considered a crime until 1938 at the earliest." 116 F.4th at 468 (citations omitted). The government's "post-founding era tradition" argument is both historically inaccurate and obviously foreclosed by *Bruen* and *Diaz*, and therefore should be disregarded by this Court.

## VI. The government does not respond to Mr. Squire's actual arguments as to why the statute is unconstitutional as applied in the home.

Finally, Mr. Squire's motion to dismiss is unique from other recent motions in that he asserts that the statute is unconstitutional as applied to his alleged possession of a firearm in his home, which, as he argued in his initial motion, is a place of special constitutional significance. R. Doc. 31 at 16-19. Because the government does not respond to Mr. Squire's particular arguments with respect to the historical record, *see* Gov't Opp. at 11-12, the Court should therefore grant his motion on that ground alone.

Of note, the government ignores Mr. Squire's arguments, both of which cited to historical evidence, that (1) "going armed" laws did not apply to the menacing use of arms for self-defense in one's home and (2) even discriminatory English laws restricting the firearm rights of religious minorities included exceptions for keeping arms in one's home for self-defense, *see* R. Doc. 31 at 18. Although the government elsewhere relies on both of those types of laws to support its dangerousness theory of disarmament, *see* Gov't Opp. at 6, 8-9, it does not explain why those laws support disarmament in the home. Moreover, the government does not respond to Mr. Squire's argument that American history is devoid of a tradition of banning the *keeping* of arms, as opposed to regulating their *carrying*. R. Doc. 31 at 19. Because the government does not meet its burden with respect to his unique as-applied challenge to possession of a firearm in the home, the Court should grant his motion.

## CONCLUSION

The government has failed to carry its burden, and the motion to dismiss therefore should be granted.

Respectfully submitted, this 18th day of October, 2024.

                              CLAUDE J. KELLY
                              Federal Public Defender

                              */s/Annalisa Mirón*
                              ANNALISA MIRÓN
                              Assistant Federal Public Defender

                              */s/ Steven Spires*
                              STEVEN SPIRES
                              Research and Writing Attorney

                              Office of the Federal Public Defender
                              500 Poydras Street, Suite 318
                              New Orleans, Louisiana 70130
                              Telephone: (504) 589-7930

**CERTIFICATE OF SERVICE**

I hereby certify that on October 18, 2024, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to the following: Sarah Dawkins, Assistant United States Attorney, 650 Poydras Street, 16th Floor, New Orleans, Louisiana 70130.

/s/Annalisa Mirón
ANNALISA MIRÓN
Assistant Federal Public Defender